**E-FILED**

Monday, 27 August, 2007 09:59:44 AM

Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

|  |  |  |
|---|---|---|
| HENRY BEVERLY and MARTINA BEVERLY, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | Case No. 05-2256 |
| EASTERN ILLINOIS UNIVERSITY, | ) ) | |
| Defendant. | ) ) ) | |

## OPINION

On August 19, 2005, Plaintiffs Henry and Martina Beverly filed their Complaint (#1) in this matter pursuant to Title VII of the Civil Rights Act of 1964 alleging they were subjected to a hostile work environment due to sexual harassment and that Defendant Eastern Illinois University retaliated against them after they complained about the harassment. Plaintiff Henry Beverly further alleges that Defendant discriminated against him on the basis of his race in failing to hire him as an adjunct professor in the school of business. On June 1, 2007, Defendant filed a Motion for Summary Judgment (#50). For the reasons that follow, Defendant's Motion for Summary Judgment is GRANTED.

### FACTS

In 2003, Henry and Martina enrolled in the School of Business at Eastern Illinois University (EIU) seeking to earn master's of business administration (MBA) degrees in finance and operational

management.  While the Beverlys were at EIU, they worked as graduate assistants (GAs), providing research and grading assistance to professors.  Henry and Martina were graders for Professors Kathawala and Green.  Martina was also a grader for another professor who retired.  Henry was also a tutor for the classes of Professors Kathawala and Green, and Martina was a tutor for statistics, organizational management and one other business course.  The basis for the bulk of the Beverlys' complaint stems from allegations of sexual harassment while working as GAs and being retaliated against by EIU after complaining about the harassment.

## A.  Allegations Regarding Hostile Environment

Mirko Plass and Bryan Huhn worked as GAs along with the Beverlys and were also MBA students.  Martina testified that in January 2004 she entered the GA work room with Henry and they overheard Huhn and Plass mention the Beverlys' names.  Henry and Martina sat at two different work stations.  Huhn sat at a work station across from Martina, and Plass sat at a table at the head of the room.  No one else was present in the room.  Martina testified she heard Plass say that "females are only good for fucks."  Martina testified that Plass and Huhn also spoke about Cheryl Noll, MBA Coordinator of the College of Business, and some fellow GA's in sexual terms.  Martina told Plass and Huhn that she found their speech inappropriate in a work environment.  Martina and Henry complained to Noll about the incident and asked Noll to speak to Huhn and Plass.  Noll took notes on what Martina said and thanked them.

The Beverlys further testified in deposition that Huhn and Plass downloaded pictures of nude women in the GA room on another day in January 2004.  Martina and Henry were working in the GA room at the time.  At one point, Martina turned to Henry and saw Plass's screen.  Martina told Henry, and Henry told them it was inappropriate.  Plass and Huhn laughed, began shutting down

their computers, then left the room.  Henry and Martina complained to Noll about the incident. When Henry told her he believed the conduct of Huhn and Plass was inappropriate, Noll shrugged her shoulders and took notes on the Beverlys' complaint.  Martina also told Noll that she believed that things were getting out of control.  Martina further testified that Huhn downloaded movies of men and women engaged in sexual intercourse on the GA room computers in February 2004. Martina indicated she saw the movie playing on Huhn's screen when she and Henry walked in the room.  The Beverlys reported this incident to Noll the next day, and Noll took notes.  The Beverlys do not know what Noll did in response.

Martina further testified that Huhn and Plass had a conversation of a sexual nature while the Beverlys were in the GA room with them in February 2004.  When the Beverlys entered the room, Huhn and Plass say, "Oh, it's them again."  The Beverlys then sat at work stations with their backs to Huhn and Plass who were sitting at another workstation facing a laptop computer.  Huhn and Plass were engaged in a discussion which was not directed at the Beverlys.  Martina testified she believed the conversation was about pornography on the laptop and she heard the conversation only momentarily.  Martina further testified that she "briefly" saw the screen shot on the laptop screen as she walked in the room.  Henry reported the incident to Noll and asked her to change the "hostile work environment."  Noll took notes and thanked the Beverlys.  The Beverlys further complained about the incident to Jane Wayland, then Associate Chair of the School of Business.  Wayland informed the Beverlys that she would speak with Noll and look into the matter further.  Henry further testified that the Beverlys asked Noll and Wayland to work in an area different than the GA room and that request was denied.

On February 12, 2004, the Beverlys met with Wayland and Noll.  The Beverlys discussed

the issues related to sexually offensive language and pornography on the computers.  Noll and Wayland said they would look into the issues.  The Beverlys further indicated they were being targeted by other GAs and treated differently by administrators.

In March 2004, the Beverlys walked into the GA room and saw a computer in one of the workstations with a nude female on the screen.  Martina shut down the computer.  Martina testified that the log-in on the computer indicated that Huhn had used the computer.  The Beverlys informed Noll of the incident the following evening.  Another day in March, the Beverlys were in the GA room with Huhn and Plass when Huhn said to Plass that "he's happy he doesn't depend on her [another GA's] ass anymore" and that "he doesn't want to have her in his life."  The Beverly further indicate that Huhn shut down his computer and left when the Beverlys entered the room on five separate occasions.  On three or four of those occasions, Martina saw that Huhn had been in a chat room or that there were offensive pictures on the screen before the computer was shut down.  Also in March, Noll sent out a letter which Martina testified reminded everyone of the rules.  Martina indicated that is why she believed Huhn acted as he did.  Martina further testified that the letter "slightly curbed" some of the actions of which she had notified Noll.

The Beverlys began working in campus locations other than the GA room.  Because the Beverlys could only access a certain database from the GA room computers, they came at a time when Plass and Huhn were not present.  In April 2004, the Beverlys entered the GA room and found Huhn, Plass, and Lacy, another GA.  The Beverlys saw a picture of several people, including a partially dressed female, on the screen of a laptop on one of the workstations.  The picture was taken down immediately after the Beverlys walked in the room.

In May, the Beverlys entered the GA room on three or four occasions and briefly saw a

picture of a nude man and woman on the computer screens.  The Beverlys shut down the computers upon seeing the pictures.  Martina testified that in August 2004 she walked into the GA room with Henry and observed "sexually explicit material" on a computer screen involving "an older male and a very young minor female."  Henry testified he believed the female was under 12 years of age because she did not have "any development of the breasts."  Henry further indicated that the video said "Brazilian teen sex movie" and the "individuals were engaged in oral, vaginal, and anal sex."  Martina testified that they reported this incident to Noll immediately.  According to Martina, Noll stated that if they could not handle porn at work they should look away.

The Beverlys further notified Blair Lord, Shirley Stewart, Nate Anderson, Robert Augustine, Monica Davenport, and Joe Barron of their complaints.  Henry testified that Stewart stamped the complaint he gave her as having been received but later called and told him that she would not be taking any action on the complaint.  Noll indicates in an affidavit that the complaints she received late in the spring 2004 semester were too general for her to take action because she did not know who was causing the alleged hostile work environment.  When Noll received a specific complaint about pornographic movies and pictures on the computers in the GA room, Noll indicates she told Melissa Gordon, her administrative assistant, to determine if there was pornography on the computers.  Noll indicates that Gordon found no pornography.  Noll further indicates that she did not receive a written complaint about pornography until August 31, 2004.  Noll states that Jeff Cross, the Associate Vice President for Academic Affairs, had the computers removed and replaced with newer models installed on September 9, 2004.  The old computers were sent to University Information Technology Services, and Noll indicates no pornography was found on them.

B.  Allegations Regarding Retaliation in Classes

Henry and Martina contend that they had trouble completing several courses required to graduate.  The first of these was a finance course taught by Professor Chiou in the Fall of 2003.  Only Henry was enrolled in this course.  Henry alleges that Professor Chiou stated to Henry on the first day of class that he knew what Henry's grade would be and it would be a C.  Henry further asserts that Chiou questioned him more than other individuals in the class and provided answers and solutions to students other than Henry.  Henry raised this issue with Wayland.  Wayland informed Henry not to rock the boat since he just started at EIU.  Henry stated in his deposition that he believes Wayland spoke to Chiou about some of the complaints.  Wayland did explain to Chiou that Henry was taking the class as a prerequisite for a graduate level class and the same standard should apply to him as that applied to other undergraduates.  Henry received a grade of a high B or low A in the course.

The second class where Henry and Martina allege they suffered discrimination was in Professor Willem's quantitative analysis course. Henry and Martina assert that they were told their solution to a problem was incorrect on an exam that constituted one-eighth of their final grade.  Henry testified that he and Martina checked with the publisher of their textbook and determined that their solutions were actually correct.  According to Henry and Martina, when they confronted Willem about the discrepancy he said nothing but "looked bewildered."  Henry and Martina assert that all of the other students had an identical answer to the problem different from them and the other students' answers were graded as being correct.  Henry further testified that he complained to Willem that other students were sharing data solutions, and Willem did not respond.  Henry believed this academic dishonesty affected his grade because Professor Willem graded on a curve.  The

Beverlys further assert Willem did not adequately control the class and they were prevented from hearing because other students were loud.  Henry and Martina both received a B in the class.  Martina testified that she and Henry informed Noll and Wayland that students were sharing exams in both Professor Willems' and Professor Boren's classes.  According to Martina, the attitudes of the faculty towards the Beverlys changed after this complaint was made.

Henry and Martina next assert they encountered discrimination in Professor Laribee's Fraud Investigations class in the summer of 2004.  Henry received a B in the class, although he feels he deserved an A.  The Beverlys further allege that Professor Laribee placed his hand on Martina's back while she was sitting on a chair and while Laribee was addressing the class. Henry testified that he believed Laribee was "trying to hit on my wife."  Martina testified that this happened three or four times.  Henry informed Laribee that he found this action inappropriate.  Laribee did not consider his conduct to be abnormal.  After Henry spoke to Laribee about the situation, Henry and Martina switched seats to make Martina inaccessible to Laribee.  Laribee allowed this and never touched Martina again.  The Beverlys further allege that Laribee once stated in class that he was viewing pornography somewhere on campus when one of his students walked up and saw what was on the computer screen.  The Beverlys also allege that Laribee made comments unrelated to class, including that he could damage data on a computer by pouring Coke over a disc that is then inserted in the computer, spoke about his marriage and divorce, made sexually related remarks in class, and commented that he sued the school.  Martina further testified that another woman in the accounting department had a problem with Laribee making suggestive comments.  Henry testified that he complained to Noll about these incidents with Laribee.  Martina further testified that Laribee once said to Henry in class that he "has it very easy with an MBA since he is African American, he gets

jobs thrown at him."

The Beverlys also allege discrimination relative to the finance class taught by Professor Zuhone in the fall of 2004.  The Beverlys testified that they did not have an acceptable level of communication with Zuhone.  Henry further indicated Zuhone would not call on him if Henry raised his hand in class.  Henry testified that if he asked Zuhone a question about a situation he would not respond with an answer.  When Zuhone did respond to their questions, he would tell them to get the book and look it up.  The Beverlys also assert that Zuhone did not return four to eight assignments to them although the assignments were returned to other students.  Approximately four weeks into the semester, Henry and Martina withdrew from the course because they did not receive any graded feedback from Zuhone. The Bevelys brought their complaints about Zuhone to the attention of Martha Brown, the Associate Dean of the College of Business and Applied Sciences, and Diane Hoadley, Dean of the College of Business and Applied Sciences, prior to their withdrawal from the class.  Henry testified that Zuhone later approached him during a fire drill and told him that he was happy the Beverlys had withdrawn from the class.

A finance class taught by Professor McGrady provides further basis for the Beverlys' complaint.  Henry testified that McGrady posted grades on the internet in a manner which identified which students earned which grades.  Martina also indicated she did not receive assignments and handouts from McGrady which were received by other students.  Henry provided a letter to Associate Dean Brown detailing the problems he encountered in the class.  The Beverlys contend that McGrady continued this behavior even after they complained.  Brown testified in deposition that she obtained a missing handout from McGrady for Martina, put it in an envelope and informed Martina by email and letter that she could pick up the handout from her receptionist.  Henry also

asserts that McGrady graded him harder than other students, including Martina who received an A in the class.  Henry further asserts that McGrady would comment about complaints of child pornography at EIU and other matters which the Beverlys had complained about while standing next to Henry, although he did not identify Henry or Martina by name.  Henry raised these concerns with Brown, and Brown told Henry she would look into it.  Brown testified she did not specifically address these issues because she believed other members of the administration were taking care of it. Henry eventually withdrew from the class. Martina also testified regarding McGrady's class that Noll had contacted him and told him not to accept the Beverlys in his fall 2004 semester class, but McGrady said he did not want to "get involved in the politics."  Henry also alleges that McGrady made him feel uncomfortable in class by walking up to the table where Henry was sitting and giving him a "clear view of his zipper."  Henry testified that he reported this to Noll in writing.

The Beverlys further allege discrimination with regard to the operations management class taught by Professor Kathawala.  Henry testified that he engaged in a "hostile exchange" with Kathawala on the first day of class during which Kathawala raised his voice.  Furthermore, Martina raised an issue because one of the graduate assistants, Mehta Chetan, who was a grader for the course, was taking the course at the same time. The Beverlys further indicate that this graduate assistant had previously been accused of plagiarism by Henry.  Wayland testified that she removed Chetan from his graduate assistant duties with Kathawala to avoid any appearance of impropriety. Henry alleges that, as a result of his complaints, he was the only student whose research topic was changed by the professor.  Henry raised this issue with Wayland and Noll.  Henry testified that Wayland informed him that the issue regarding Chetan was not his business, but was university business.  After the Beverlys met with Wayland and Noll, it was arranged for the Beverlys to take

the course as an independent study with another professor.  The Beverlys assert that they were required to write a paper every week as part of the independent study course and this held them to a higher standard than students in the normal course.  The Beverlys further allege that Wayland informed Martina during their meeting that she could take an employment law course, but later told Martina she could not do so.  The Beverlys further allege that Professor Kathawala "tricked" them into doing personal work for him by asking them to research stocks that he intended to purchase.  The Beverlys complained about this and allege that Kathawala took negative actions against them as a result.

The Beverlys also allege that Noll talked to two finance professors before the fall of 2004 to inform them that the Beverlys did not meet certain criteria for taking the classes.  The Beverlys were initially approved to take 6 credit hours of undergraduate classes to substitute for graduate classes.  The Beverlys assert that if they were forced to drop these 6 credit hours without replacing them they would not have been full-time students and thus could not be GAs.  The Beverlys were allowed to enroll in the classes, however, because the professors of these classes determined the Beverlys did not lack the basic foundations of the material even though they had not taken certain financial courses.  Henry further alleges that Noll and Wayland approached professors to encourage them to lower his grades.  Henry testified that McGrady admitted he had a conversation with Noll and Wayland about the Beverlys' performance.  Henry had no other evidence to support this claim.  Martina testified that the evidence supporting this allegation is that Noll told them via email that they "did not qualify for the finance exams any more at the beginning of the fall 2004 semester."

### C.  Remaining Allegations of Retaliation

Another situation giving rise to the Beverlys' complaint relates to pictures of GAs that were

hung in the GA room on a cork board.  Martina testified that in April 2004 her picture had several cuts in it which she believed were made with a knife or scissors. The Beverlys notified Noll of the situation.  Noll indicated she would look into it.  The Beverlys believe the damage was a result of their complaints about sexually inappropriate behavior in the GA room.  The Beverlys reached this conclusion because the other GAs stopped giving them the "greeting of the day."  The Beverlys testified the picture was not removed until September 2004.  The Beverlys further contend that when Noll sent out reminders about appropriate conduct for GAs, some GAs blamed the reminders on the Beverlys and told them that they should be able to have more fun.  The Beverlys further indicate that GAs pulled out computer cables from the GA room to hinder their ability to perform their GA duties because issues with the cables began the day after they filed their complaint.  The Beverlys further state that they were excluded from an email list for MBA news.

The Beverlys also testified that their complaint led to problems with Professor Green, whom the Beverlys served as GAs.  The Beverlys assert Professor Green told them to drop their complaints and Green substantiated that Wayland interfered with the Beverlys' use of office equipment and access to software.  The Beverlys further allege Hoadley told Green not to give them credit for work they did with him.  Green did not list them as co-authors on a paper they worked on with Green, but Green testified that he gave them credit for research assistance at the end of the paper.  With regard to another paper regarding speech recognition software which was also published, Green testified that he did not give the Beverlys credit because he had to redo much of the work for the paper.  Martina testified that Green had informed them Noll, Wayland, and Hoadley told him not to give the Beverlys credit for the publication.  Martina further indicated Green told her if the Beverlys did not stop complaining they would "lose their GA work assignment with him."  The Beverlys further

allege that Wayland and Noll made it difficult for them to do their graduate assistant duties for Green by restricting their access to a hole punch binding machine.

The Beverlys' next claim relates to their use of the Business College computer server. The Beverlys assert that they could not use the GA room computers between April and September 2004 as a result of being unable to log into the College of Business server. However, the Beverlys were still able to access the information sought through other computers on campus. The Beverlys state that other GAs were able to log in to the server during that time frame and believe the reason they were unable to log in at the GA room was because of their complaints about sexually inappropriate material in the GA room. The Beverlys base this assertion on their reasoning that by keeping them out of the GA room they would be prevented from making further complaints. The Beverlys' access was restored in August 2004.

The Beverlys further assert that an employee of EIU, Eric Knuth, an LAN Support Specialist for EIU and also a student, attempted to break into their personal email account on September 10, 2004. Henry testified that Knuth attempted to communicate with the Beverlys through using the university email. Knuth cut and pasted in "documentation to show that he had tried to communicate to [the Beverlys] through [their] private non-EIU email account." Henry testified that the cut and pasted document indicated Knuth was "attempting to log into an Earthlink account which [sic] identified as my personal account which has been mine since 2000." Henry testified this information was contained in a "five or six digit alpha numeric code" in the document. Henry further testified that an "individual was attempting to dial into an Earthlink account without the proper protocol" and that information came "from Earthlink reference material on the Earthlink site." Martina testified this could have been an attempt to distribute child pornography under

-12-

Henry's email address.  The Beverlys provided a copy of this email to Joe Barron, University Counsel for EIU.  The Beverlys contend that Knuth attempted to hack into their email accounts in retaliation for their complaints to EIU.  Henry testified that Knuth was the "overseer" of the system and as overseer was responsible for monitoring whether individuals downloaded pornography or engaged in other illegal activities.

Knuth testified in deposition that he attempted to send the Beverlys an email to their Earthlink account to tell them some software they requested was ready to be picked up.  Knuth testified he received the email address from the MBA office.  Knuth stated that he got their EIU email address from the MBA office after the email he attempted to send to the Earthlink account bounced back to him.

The Beverlys filed a complaint with the Charleston Police Department regarding the email incident.  Officer Harold Harris, a part-time detective for EIU, was assigned to investigate the complaint.  Henry testified that Harris left a message asking to set up an appointment to visit his campus office to discuss the incident, but later Harris showed up at the Beverlys' home on October 3, 2004.  Martina testified that Harris showed up at their door on a Sunday morning dressed in uniform and did not show his identification.  Martina further testified that Harris came into their home without an invitation.  According to Martina, she stood with Henry and Harris in the entryway and living room of their home for a while then asked if they could sit outside because their house was filled with packed boxes as it was the end of the semester.  The Beverlys further asked for a business card and to have the conversation recorded, but Harris denied both requests.  Martina testified that Harris informed them he was dispatched by EIU to investigate their complaints.  Henry testified that Harris said Joe Barron had directed him to come to the Beverlys' residence and that

EIU wanted them to drop their complaint.  Henry responded that he would not drop the complaint and Harris should be investigating their allegation of child pornography on university computers. Harris was at the Beverlys' residence for over three hours.  Henry testified that part of that time he was informing Harris how he was violating law enforcement training.  Henry further testified that Harris told them that if he persuaded the Beverlys to drop their complaints he would be hired for a full time position with EIU.  Martina also testified that Harris told them that EIU was in a better situation than they were and that they would regret it if they did not withdraw complaints they had filed.  Henry further testified that Harris informed them EIU "had placed people in the newspaper before and harmed them, and he would hate to see us in the newspaper done the same way."  The Beverlys further state that Harris attempted to intimidate them due to his height.  Martina stated that EIU sent "the biggest guy out they had, and they sent the blackest guy out they had."  Martina testified that she told Harris she was not intimidated.  Harris testified he had no knowledge of any of the Beverlys' complaints about pornography on computers until after he was at the Beverlys' residence.  Henry further testified that he asked Officer Harris for his gun during the course of the conversation, and Harris gave his gun to Henry.

Henry and Martina also believe they were discriminated against by being denied access to software.  Knuth is responsible for providing software to EIU business students.  In the spring of 2004, Henry and Martina allege they were denied access to the program Visio by Knuth.  As a result, Henry and Martina had to use their personal Visio software to complete research for Professor Green.  Henry testified that he raised the issue with Hoadley and she provided it.  Henry stated that the Provost informed him that he would talk with Hoadley about the issue and Henry believed this led Hoadley to give him the software.  Henry also testified that Hoadley made them sign for the

software when they received it, but other students were not required to sign for software.

The GA room was eventually moved to a larger room and the previous GA room was converted to the office of a visiting professor.  Henry testified that after the move, Noll made the accusation that certain GAs appeared to have taken university resources, such as printer cables and toner cartridges.  Henry indicated that when Noll was saying these things to a group of GAs, she was staring at him and Martina who were sitting by themselves in a corner.  In her affidavit, Wayland states that the Beverlys used a key to enter the visiting professor's office on September 1, 2004.  According to Wayland, the Beverlys took a set of headphones and photographed the office.  Noll states in her affidavit that the Beverlys gave these photographs to her on a floppy disk in a plastic bag with a sticker on the outside that depicted the scales of justice and  said "equality."  The Beverlys stated that the pictures were evidence of unethical behavior.  Wayland and Noll considered the Beverlys' behavior inappropriate.  Henry testified that he had not been told not to go in the room, that the room was still labeled a GA office, and they still had a key so believed they had access to the room.  Henry contends the pictures depict items which Noll had indicated were stolen.

The Beverlys further allege that they were called "Puritans" by Dr. Augustine, Dean of the Graduate School.  Martina testified that Augustine approached the Beverlys after a newspaper article was printed about the Beverlys' work at an animal shelter.  Martina testified that Augustine complimented the Beverlys on the article then said, "but all your complaints, are you part of these Puritans?"  Martina further indicated Augustine asked if they had access to their computers again to determine if the issue had been resolved.  Henry testified that he took the term Puritans as negative and that Augustine meant they were "overzealous."

The Beverlys also take issue with some grades they received.  Henry appealed his grades in

MBA 5500, a class taught by Professor Willems, and ACC 5100, a class taught by Professor Laribee.  Martina also appealed her grade in MBA 5500.  In appealing a grade, the student brings the issue to the professor's attention by making a written request.  The chair of the department, the professor, and the student then meet to discuss the basis for the appeal and to allow the student to present any evidence.  If that meeting does not resolve the issue, the student may appeal the decision to the Department Grade Appeals Committee.  The Committee is comprised of three faculty members and one graduate student representative.  A hearing is held and the committee makes a recommendation that the appeal is either supported or unsupported.  The student may ultimately appeal the grade to the Dean of the Graduate School who has final decision making authority.  Henry testified that he requested the grade appeal hearings be held as soon as possible and Wayland indicated she would try to schedule them before October 2004.  Dean Augustine initially informed Henry he was having a difficult time finding a student representative to sit on the board for the Beverlys' grade appeal.  However, the day before the hearing Augustine informed Henry that he had identified a student.  Henry testified that Wayland "dragged out the hearing" until December 2004 "constructively" making it so the Beverlys could not attend the hearing.  Henry further indicated he was not notified until the day before the hearing.  The Beverlys did not attend the hearing.  According to Henry, the Beverlys could not attend because it was during finals week.  Henry and Martina received their MBA's from EIU on time and graduated with A averages.  They did not have trouble enrolling in any of the classes required to graduate.

The Beverlys' also allege that EIU interfered with their employment after graduation.  Henry testified that at a job fair he observed Professor Minnis speaking with a recruiter from Clifford Accounting.  When Henry approached, Professor Minnis said that Henry was the guy he was talking

-16-

about.  Henry does not know what was said between the two but believes it was negative.  Another instance involved employment with Glaxo Smith Kline.  Martina testified that they spoke with Robert Ingram of Glaxo Smith Kline at a breakfast session and he stated the company was accepting resumes and was looking for people with international business and foreign language experience. The Beverlys gave Ingram their resumes.  Martina testified Ingram told her "you have no problems." Ingram further stated the Beverlys were "two very good examples about networking" and informed them he was "in the position to fill the position."  Henry testified he later received a call from an assistant to Ingram who informed him that their resumes were being actively reviewed for positions. Martina testified she later learned from Ingram's secretary that there was no interest in their resumes.  Martina indicates she was informed by Michael Abebe, another GA at EIU, that Wayland was behind getting Glaxo Smith Kline to reject the Beverlys as applicants because she is the gatekeeper for resumes to deliver to Glaxo Smith Kline.  Martina stated that Abebe also informed the Beverlys that they can "forget about finding employment" because of their complaints.  Martina did not know where Abebe got this information, but believed it came from faculty members with whom he worked.

Martina also testified that Wayland interfered with the Beverlys' attempt to gain employment with Caterpillar.  Martina testified that she was informed by Professor Monippallil that Wayland asked him for a list of individuals who would be qualified for a position at Caterpillar.  Monippallil sent Wayland an email indicating Henry and Martina were the most qualified, to which Wayland responding by an email which stated "'thanks' with a bunch of dots behind it."  Monippallil also told Martina she would have problems finding employment because Wayland would "weed us out for job openings."  The Beverlys believe that each time their resumes are rejected by a company that

-17-

EIU is behind it.  Martina further testified that the Beverlys would see Wayland or Minnis talking to companies before or after the Beverlys gave their resumes to the companies at career fairs. However, Martina did not hear any of the conversations held between employers and Wayland or Minnis.  Wayland states in her affidavit that she did speak with the Glaxo Smith Kline representative.  Wayland indicates she said nothing negative about the Beverlys, but said they are "very professional."  Wayland further states she has never been contacted by a potential employer regarding hiring the Beverlys or talked to any prospective employers about the Beverlys.

### D.  Henry's Failure to Hire Claim

Henry further states that he was discriminated against when EIU failed to hire him for a faculty position.  Henry testified that he applied for a faculty job with EIU's accounting department on December 13, 2003.  The person who ultimately got the job was Steven Benner.  The position required an MBA, and Henry did not have an MBA at the time.  Benner did have an MBA degree, but Henry testified Benner was not qualified because Henry did not believe he had accounting experience or a degree in accounting.  Henry believes he was not hired as a result of discrimination because Professor Laribee stated that no minorities applied for the position, and Henry is African-American.  Henry testified that he not only applied, but also interviewed for the position.

Henry further testified that due to the environment at EIU he sought treatment for "open lesions in the chest" that would spontaneously bleed.  Martina testified that she experiences sleep problems and stomach cramping.

### ANALYSIS

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

-18-

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000), quoting Pipitone v. United States, 180 F.3d 859, 861 (7th Cir. 1999). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Burwell v. Pekin Cmty. High Sch. Dist. 303, 213 F. Supp. 2d 917, 929 (C.D. Ill. 2002). Speculation, however, is not the source of a reasonable inference. See Burwell, 213 F. Supp. 2d at 929, citing Chmiel v. JC Penney Life Ins. Co., 158 F.3d 966, 968 (7th Cir. 1998).

Therefore, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248. Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1111 (7th Cir. 2004). If the evidence presented is "merely colorable" or is not "significantly probative," summary judgment may be granted. Anderson, 477 U.S. at 249-50. Moreover, a plaintiff cannot defeat summary judgment by raising immaterial issues of fact. See Jordan v. Summers, 205 F.3d 337, 345 (7th Cir. 2000). Material facts are facts that "might affect to outcome of the suit" under the applicable substantive law. Anders v. Waste Mgmt. of Wis., Inc., 463 F.3d 670, 675 (7th Cir. 2006),

-19-

quoting <u>Anderson</u>, 477 U.S. at 248.

## I.  Sexual Harassment Claims

Martina and Henry first argue that they were subjected to sexual harassment while working as GAs at EIU.[1]  In order to establish a prima facie case for sexual harassment, a plaintiff must show that: (1) he or she was subjected to unwelcome harassment; (2) the harassment was based on his or her sex; (3) the harassment was sufficiently severe or pervasive so as to alter the condition of his or her employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability.  <u>Boumehdi v. Plastag Holdings</u>, 489 F.3d 781, 788 (7th Cir. 2007).

The allegations of the Beverlys regarding sexual harassment which occurred in the GA room must fail because they fail to meet the second prong of the prima facie case.  "Because Title VII is premised on eliminating discrimination, inappropriate conduct that is inflicted on both sexes, or is inflicted regardless of sex, is outside the statute's ambit."  <u>Wieland v. Dep't of Transp. of State of Ind.</u>, 98 F. Supp. 2d 1010, 1019 (N.D. Ind. 2000), <u>citing</u> <u>Holman v. State of Ind.</u>, 211 F.3d 399, 406 (7th Cir. 2000).  "'The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment *to which members of the other sex are not exposed*.'"  <u>Holman</u>, 211 F.3d at 403, <u>quoting</u> <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 80 (1998) (emphasis in original).  "Harassment that is inflicted without regard to gender, that is, where males and females in the same setting do not receive disparate treatment, is

---

[1]  EIU argues that the Beverlys are not covered by Title VII because they cannot be considered employees while working as graduate assistants in that their role is more that of a student.  However, this court needs not address this argument because the Beverlys' Title VII claims are otherwise not viable.

not actionable because the harassment is not based on sex." Pasqua v. Metropolitan Life Ins. Co., 101 F.3d 514, 517 (7th Cir. 1996). All of the allegations made by Henry and Martina that occurred in the GA room happened when both Henry and Martina were present. There is no indication in the record that any of the incidents to which the Beverlys were exposed happened because Martina was female or because Henry was male. Rather, assuming the Beverlys' statements are accurate, the atmosphere  in the GA room of which Henry and Martina complain would be equally offensive to both genders. The record indicates that both Henry and Martina found the pornographic materials offensive. Accordingly, the Beverlys' claims based upon the occurrences in the GA room do not give rise to a claim under Title VII.

The only allegations made by the Beverlys which did not affect both of the Beverlys equally are Martina's allegation that Professor Laribee touched her back in class, Henry's allegation that Professor McGrady gave him a "clear view of his zipper," the few comments the Beverlys allege that Huhn and Plass made specifically about women, and arguably the few occasions where Henry and Beverly found pictures of partially dressed women alone. EIU argues that these allegations do not rise to the level of being "severe or pervasive" and are thus insufficient to state claim under Title VII. To establish a claim for a hostile work environment, "the alleged harassment must be 'both subjectively and objectively so severe or pervasive as to alter the conditions of her employment and create an abusive working environment.'" Whittaker v. Northern Ill. Univ., 424 F.3d 640, 645 (7th Cir. 2005), quoting Wyninger v. New Venture Gear, Inc., 361 F.3d 965, 975 (7th Cir. 2004). In determining whether the harassment is objectively hostile, the court is to "consider all of the circumstances, including the frequency and severity of conduct, whether it is threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interferes with an

employee's work." Whittaker, 424 F.3d at 645. This court concludes that the Beverlys' allegations do not rise to the level of being actionable because they are "relatively isolated instances of non-severe misconduct." Saxton v. American Tel. & Tel. Co., 10 F.3d 526, 533 (7th Cir. 1993).

Martina alleges only that Professor Laribee touched her back with an open hand three or four times. Thereafter, Martina switched seats and the conduct did not happen again. Similarly, Henry's allegations that Professor McGrady stood in front of him giving him a view of his zipper was a single isolated incident and not so objectively severe as to give rise to a sexual harassment claim. Title VII "do[es] not mandate admirable behavior from employers." Russel v. Bd. of Trs. of Univ. of Ill., 243 F.3d 336, 343 (7th Cir. 2001). Furthermore, the remarks about women made by Huhn and Plass and the few images of nude women alone which Huhn and Plass had on their computers are also not sufficient to sustain a hostile work environment claim. The Beverlys allege that on one occasion Plass made the statement "females are only good for fucks, " Plass and Huhn spoke about Noll and some fellow GA's in sexual terms, and Plass once stated that "he's happy he doesn't depend on her [another GA's] ass anymore" and that "he doesn't want to have her in his life." Teasing, offhand comments, and isolated, non-egregious incidents are not sufficient to constitute sexual harassment. See Farragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). These remarks were made infrequently and were not directed at Martina but rather overheard by her. Therefore, this court concludes the statements did not create an objectively hostile work environment. See Hildebrandt v. Illinois Dept. of Natural Resources, 347 F.3d 1014, 1034-35 (7th Cir. 2003) (overheard and isolated remarks made by coworkers insufficient to create cause of action for harassment). In addition, there is no evidence in the record that the nude pictures of women that Henry and Martina found on Plass's and Huhn's computers in the GA room were directed at Martina

but rather she observed them on their computer screens.  As a result, these images also cannot give rise to a claim for harassment.  See Yuknis v. First Student, Inc., 481 F.3d 552, 553 (7th Cir. 2007). Accordingly, summary judgment in favor of EIU is warranted on the Beverlys' sexual harassment claims.

## II.  Retaliation Claims

Title VII forbids an employer from "discriminat[ing] against" an employee because that person "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation.  Burlington N. & Sante Fe Ry. Co. v. White, 126 S. Ct. 2405, 2408 (2006), citing 42 U.S.C. § 2000e-3(a).  To prevail on a claim of Title VII retaliation under the direct approach, a plaintiff must present evidence of: (1) a statutorily protected activity; (2) an adverse action; and (3) a causal connection between the two.  Burks v. Wisconsin Dep't of Transp., 464 F.3d 744, 758 (7th Cir. 2006).  The Beverlys do not claim to have evidence of causation in this case and are proceeding using the indirect method.  In order to establish a prima facie case of Title VII retaliation under the indirect approach, a plaintiff must offer evidence of the following: (1) that he engaged in statutorily protected activity; (2) that he was performing his job satisfactorily; (3) that he was subject to a materially adverse action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. Moser v. Ind. Dep't of Corr., 406 F.3d 895, 903-04 (7th Cir. 2005).  If the plaintiff establishes the prima facie case of retaliation, the burden shifts to the employer to present evidence of a non-discriminatory reason for its employment action.  Moser, 406 F.3d at 904.  If the employer meets its burden, the burden shifts back to the plaintiff to demonstrate that the employer's reason is pretextual.  Moser, 406 F.3d at 904.

A number of the Beverlys' allegations of retaliation, assuming their veracity for purposes of summary judgment, do not rise to the level of being materially adverse. Thus the Beverlys have failed to establish a prima facie case on these claims.[2] The Seventh Circuit has recently stated that although adverse employment action is interpreted broadly, "not everything that makes an employee unhappy is an actionable adverse action." Lewis v. City of Chicago, __ F.3d __, 2007 WL 2128308 at *6 (7th Cir. 2007). "The 'purpose of the adverse employment action requirement is to provide a reasonable limiting principle for the type of conduct actionable under the statute.'" Lewis, 2007 WL 2128308 at *6, quoting Phelan v. Cook County, 463 F.3d 773, 780 (7th Cir. 2006). "[M]ere unhappiness and inconvenience are not actionable under Title VII." Haywood v. Lucent Tech., Inc., 323 F.3d 524, 532 (7th Cir. 2003). Rather, "the employee must complain of some action on the employer's part that causes her to suffer a real harm." Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 902 (7th Cir. 2003). The adverse action requirement is used to "distinguish meritorious cases from trivial personnel actions brought by irritable, chip-on-the-shoulder employees." Lewis, 2007 WL 2128308 at *6. In the retaliation context, the "'challenged action must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity.'" Lewis, 2007 WL 2128308 at *6, quoting Roney v. Illinois Dep't of Transp., 474 F.3d 455, 461 (7th Cir. 2007).

The first series of complaints relate to problems the Beverlys encountered in classes in their

---

[2] This court further notes that the Beverlys are alleging some of the actions taken by professors were in retaliation for complaints they made about the manner in which the professors conducted the class and not in retaliation for complaints regarding matters protected by Title VII. It is somewhat difficult based upon the submissions of the Beverlys to determine which retaliation they believe resulted from which complaints. Therefore, this court will address the matters as though all of the actions resulted from protected conduct.

role as students at EIU.  With regard to Henry's complaints about Professor Chiou's class, Henry asserts that Chiou questioned him more than other individuals in the class and provided answers and solutions to students other than Henry.  Henry testified that he believed Wayland spoke to Chiou about some of the complaints.  In the end, Henry received a high B or low A in the course.  The Beverlys' claim with regard to Professor Willems' class is that they were told a solution to a problem was incorrect which the Beverlys' testified was not incorrect and this problem constituted one-eighth of their grades.  The Beverlys further complain that Willems did not stop other students from sharing data solutions and did not adequately control the class.  In Professor Zuhone's class, the Beverly's allege retaliation on the basis that they did not have an acceptable level of communication with the professor and did not receive their graded assignments back.  With regard to Professor McGrady, Henry testified that McGrady posted grades on the internet in a manner which identified which students earned which grades.[3]  Martina also indicated she did not receive assignments and handouts from McGrady which were received by other students.  Henry also asserts that McGrady graded him harder than other students, including Martina who received an A in the class.[4]  Henry further asserts that McGrady would comment about complaints of child pornography at EIU and other matters which the Beverlys had complained about while standing next to Henry, although he did not identify Henry or Martina by name.  With regard to Professor Kathawala, the Beverlys allege that Henry engaged in a "hostile exchange" with him and Henry was the only student whose research topic was changed by the professor.  The Beverlys finally took the class

---

[3]  This is behavior which affected all students, not just Henry and Martina.

[4]  This court notes it belies Henry's claim that this was retaliation as the same complaints were being made by Martina who received an A in the class.

independent study and as a result assert they were held to a higher standard than the normal course.

Despite these allegations, it is undisputed that the Beverlys received their MBA's from EIU on time, graduated with A averages, and did not have trouble enrolling in any of the classes required to graduate.  Furthermore, the complaints made by the Beverlys are complaints typical of students in a university setting.  As discussed above, while the Beverlys may have been unhappy with these things which happened in their classes, mere unhappiness is not sufficient to give rise to a Title VII claim.  In addition, because these complaints are typical of that which any student could encounter with different professors and different classes, this court finds that the allegations are not "materially adverse such that [other graduate assistants] would be dissuaded from engaging in the protected activity."  Lewis, 2007 WL 2128308 at *6.

The Beverlys allege a number of other incidents occurred as a result of retaliation which, again assuming they are true for purposes of summary judgment, do not rise to the level of being materially adverse.  Martina testified that in April 2004 her picture had several cuts in it which she believed were made with a knife or scissors.  The Beverlys further allege that Wayland and Noll made it difficult for them to do their graduate assistant duties for Green by restricting their access to a hole punch binding machine.  The Beverlys also assert that they could not use the GA room computers between April and September 2004 as a result of being unable to log into the College of Business server.  However, the Beverlys were still able to access the information sought through other computers on campus.  Furthermore, the Beverlys' access was restored in August 2004.  Henry and Martina also believe they were discriminated against by being denied access to the program Visio by Knuth.  However, Henry and Martina were able to use their personal Visio software to

complete research for Professor Green.  The Beverlys further allege that they were called "Puritans" by Dean Augustine.  Again, these allegations  amount to nothing more than mere inconveniences or unhappiness on the part of the Beverlys and did not result in the Beverlys suffering any real harm.

The Beverlys' assertion that Officer Harris was sent to their house to retaliate against them for their complaints is also insufficient to establish a prima facie case.  Martina testified that she told Harris she was not intimidated.  The Beverlys who admittedly were not intimidated[5] have failed to indicate how these alleged threats by Officer Harris are materially adverse actions.  See Smith v. Northeastern Ill. Univ., 388 F.3d 559, 568 (7th Cir. 2004) (allegation of threat of losing home and officer stopping by house insufficient to establish adverse action on retaliation claim).  As concerns the Beverlys' allegation that their grade appeals were postponed as a result of their complaints, there is no indication that their appeals had any merit or that the Beverlys could not have rescheduled the matter to a time other than during their final exams.  Therefore, this court concludes that the Beverlys have again failed to demonstrate this was a materially adverse action.

The remaining allegations made by the Beverlys are insufficient to survive summary judgment as these allegations are completely lacking in evidentiary support and are the product of mere speculation on the part of Henry and Beverly.  With regard to Henry's claim that Noll and Wayland approached professors to encourage them to lower his grades, Henry testified that the only evidence he has to support this claim was that McGrady admitted he had a conversation with Noll and Wayland about the Beverlys' performance.  The Beverlys further indicate that GAs pulled out computer cables from the GA room to hinder their ability to perform their GA duties.  Again the

---

[5]  In fact, the Beverlys testified that they asked Officer Harris to hand them his gun and he complied.

only evidence to support this is the Beverlys' conjecture because issues with the cables began the day after they filed their complaint.   The Beverlys further allege Hoadley told Green not to give them credit for work they did with him. However, Green did not give any indication of this in his deposition testimony.  Green testified that he gave them credit for research assistance at the end of one paper.  With regard to another paper regarding speech recognition software which was also published, Green testified that he did not give the Beverlys credit because he had to redo much of the work for the paper.

The Beverlys' allegations that EIU interfered with their prospective employment are similarly lacking in evidentiary support. Martina indicates she was informed by Michael Abebe, another GA at EIU, that Wayland was behind getting Glaxo Smith Kline to reject the Beverlys as applicants because she is the gatekeeper for resumes to deliver to Glaxo Smith Kline.  Martina stated that Abebe also informed the Beverlys that they can "forget about finding employment" because of their complaints.  Martina did not know where Abebe got this information, but believed it came from faculty members with whom he worked.   In addition, the Beverlys did not submit an affidavit from Abebe or submit deposition testimony from him which would support this allegation.  Henry also testified that at a job fair he observed Professor Minnis speaking with a recruiter from Clifford Accounting.  When Henry approached, Professor Minnis said that Henry was the guy he was talking about.  Henry does not know what was said between the two but merely assumed it was negative. Martina also testified that Wayland interfered with the Beverlys' attempt to gain employment with Caterpillar because she was informed by Professor Monippallil that Wayland asked him for a list of individuals who would be qualified for a position at Caterpillar.  Monippallil sent Wayland an email indicating Henry and Martina were the most qualified, to which Wayland responding by an

email which stated "'thanks' with a bunch of dots behind it."   This court fails to see the inculpatory value of this evidence.   Martina further testified that the Beverlys would see Wayland or Minnis talking to companies before or after the Beverlys gave their resumes to the companies at career fairs. However, Martina did not hear any of the conversations held between employers and Wayland or Minnis.

Similarly, the Beverlys' allegation that Knuth attempted to break into their personal email account lacks any evidentiary support.  The sole evidence to support this claim is Henry's testimony concerning a "five or six digit alpha numeric code" contained in the email cut and pasted into the email sent from Knuth to Henry on his EIU account.  Henry testified that this code indicated  that an "individual was attempting to dial into an Earthlink account without the proper protocol" and that information came "from Earthlink reference material on the Earthlink site."  However, the Beverlys have failed to submit any documentation from Earthlink to support this claim.  As discussed above, while the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party on summary judgment, speculation is not a source of reasonable inference.  See Burwell, 213 F. Supp. 2d at 929.  Accordingly, summary judgment is warranted on the Beverlys' claims of retaliation.

### III.  Henry's Failure to Hire Claim

Henry further brings a failure to hire claim pursuant to Title VII, alleging that EIU discriminated against him on the basis of his race, African-American, when he was not hired for the faculty position in the accounting department.  A claim of discrimination under Title VII may be proven directly or indirectly.  O'Neal v. City of New Albany, 293 F.3d 998, 1003 (7th Cir. 2002). In order to establish his prima facie case under the direct method, Henry must prove that EIU was

motivated by animus based upon his race when he was denied the teaching position.  See Mosley v. Maytag Corp., 2006 WL 213950, at *4 (C.D. Ill. 2006).

Henry presents two remarks made by Professor Laribee as direct evidence of discrimination: (1) Laribee's statement that no minorities applied for the position and (2) Laribee's statement in class that Henry "has it very easy with an MBA since he is African American, he gets jobs thrown at him."   EIU argues that these statements were simply stray remarks unrelated to the hiring decision.   "Stray remarks that are not 'proximate and related to the employment decision' are insufficient to defeat summary judgment."   Lerner v. Ravenswood Hosp. Med. Ctr., 1999 WL 1267710, at *5 (N.D. Ill. 1999), quoting Bahl v. Royal Indem. Co., 115 F.3d 1283, 1293 (7th Cir. 1997).   However, the statements of one who lacks the final decision-making authority may be probative of intentional discrimination if that individual exercised a significant degree of influence over the contested decision.  Lerner, 1999 WL 1267710, at *5.

In the instant case, Michael Borom, Chair of the School of Business, testified that Wayland was responsible for making the hiring decision for the accounting faculty position.  Henry testified that it was Michael Borom that interviewed him for the position.  Henry has presented no evidence that Laribee played any role, let alone a significant role, in the hiring decision for the accounting faculty position.  Assuming Laribee did play a role in the decision, where an individual defendant casts only one of many votes, the defendant's actions are "too attenuated from the adverse actions befalling Plaintiff to constitute probative evidence of intentional discrimination."  Lerner, 1999 WL 1267710, at *5 (N.D. Ill. 1999), citing McCarthy v. Kemper Life Ins. Cos., 924 F.2d 683, 686 (7th Cir. 1991).  In this case, Laribee did not make the decision not to hire Henry.  At most, he played a role in the decision.  Furthermore, a remark must be made around the time of the adverse

-30-

employment action to be evidence of discriminatory intent.  See McMiller v. Board of Trs. of the Univ. of Ill., 275 F. Supp. 2d 974, 980 (N.D. Ill. 2003).  Martina testified that the remark about Henry getting jobs "thrown at him" was made in Laribee's  accounting class, not at the time Henry applied for the job.  Accordingly, this court concludes Henry has not presented sufficient evidence to survive summary judgment under the direct method of proof.

Because Henry has failed to produce sufficient direct evidence of discrimination, his claim must be evaluated under the indirect method of proof as established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Traylor v. Brown, 295 F.3d 783, 787-88 (7th Cir. 2002).   To establish a claim for failure to hire under the indirect method, Henry must demonstrate: (1) he was a member of a protected class; (2) he was qualified for an open position for which he applied; (3) his application for employment was rejected; and (4) the employer filled the position with someone outside of the protected class, or left the position open.  Blise v. Antaramian, 409 F.3d 861, 866 (7th Cir. 2005).  The burden then shifts to EIU to "articulate a legitimate, nondiscriminatory reason" for its decision not to hire Henry.  Blise, 409 F.3d at 867.  If EIU sets forth a legitimate, nondiscriminatory reason for failing to hire Henry, Henry must show that there is a question of fact as to whether the proffered reason was a pretext.  Lawhead v. Ceridian Corp., 463 F. Supp. 2d 856, 864 (N. D. Ill. 2006).  A reason is pretextual where the employer's explanation is factually baseless, was not the real motivation for the decision, or was insufficient to motivate the decision.  Lawhead, 463 F. Supp. 2d at 864.

EIU argues that Henry has failed to establish a prima facie case of discrimination because he was not qualified for the accounting faculty position.  There is no dispute that the position required an MBA degree, and at the time Henry applied he did not have an MBA degree.  Henry

argues that he did have a Master's degree in accountancy and therefore he should have received the position regardless of whether he had an MBA. Borom testified, however, that the position required an MBA for program accreditation purposes. Even if Henry could somehow establish a prima facie case, he has still failed to demonstrate that EIU's reason for failing to hire him was pretextual. It is undisputed that the person who received the position held an MBA and Henry did not at the time. Accordingly, summary judgment is warranted in favor of EIU on Henry's failure to hire claim.

IT IS THEREFORE ORDERED:

(1) Defendant's Motion for Summary Judgment (#50) is GRANTED.

(2) The final pretrial conference scheduled for October 5, 2007, at 3:30 p.m. and the jury trial scheduled to begin October 15, 2007, are VACATED.

(3) This case is terminated.

ENTERED this 27th day of August, 2007

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE